May it please the Court, Keith Letourneau for Valero Marketing and Supply Company, and with the Court's permission, I'd like to reserve three minutes for rebuttal. Very well, Keith. Keep an eye on the clock. Yes, Your Honor. To find Valero viable in this case, Milos Tankers has the double hurdle of having to prove that Valero is bound both by the Bill of Lading and Charter Agreements Terms and Conditions. Valero was not a party to either the Bill of Lading or the Charter. They contracted with Coke to purchase and transport the cargo in fully paid Coke. Milos, in this case, is going after a fully paid Coke. How much? What did they pay Coke for? They paid Coke for the purchase of the cargo and for the transportation of the cargo. It was a combined sum for that. What kind of an arrangement was it? Was it the CIR? It was a contract of sale with Coke. It was not a charter agreement. And so Valero... What you're really arguing is Valero has no... They've already paid the freight. They have already paid the freight, Your Honor, and it would not be equitable for Valero to have to pay Milos Tankers for the distribution. Didn't Valero ask Milos to do more? Here they asked to expedite. They were involved at that stage. I thought that's what the record showed. No, it does not, Your Honor. In fact, that's one of the issues that I wanted to raise with the Court in terms of clarifying exactly what the record does say. Factually, and contrary to Milos' assertions, Valero communicated only with its contracting party, Coke, concerning the vessel during the voyage. Valero communicated with Coke, asked for the vessel's ETA, and then suggested that the vessel be directed to proceed at max speed if it became apparent that the vessel wasn't going to meet its ETA and made note that that was going to be for Coke's account in that event. Those were the words used. Yes, Your Honor, and that is found at ER 089, paragraph 14, as well as email at ER 229. Also contrary to Milos' assertions, Valero did not provide discharge orders to the vessel, and that can be found at ER 356. The discharge orders went from the discharger, DP Global, to the vessel. Valero did provide its own discharge orders amongst its group of personnel, including its agent, and that can be found at ER 203. Is there a contract between Coke and the person who put this transaction together, BP? Is there a contract between them as to how they would, their negotiations that's in this record? Your Honor, I mean, I look for it because it seems to me that would be important because if Coke is getting the money for the exchange for the freight, and Coke got BP to set this up, and, in fact, BP, according to the facts, would not only have been the one who was supposed to pay based on the charter policy, but also the one who gave the letter of indemnity, which allowed, which then caused poor Milos to discharge its freight and release its lien. It seems to me there should have been or could be some idea of what that relationship was, such that poor Milos would have some way to, if you will, recover the freight that now Coke's going, based on this record, going away free with. Well, Your Honor, you're absolutely right, and Coke did have a contractual relationship with GP Global, and the way those contractual relationships work, here you had Milos Tankers is the owner, GP Global is the charterer, and then in the relationship between GP Global and Coke, GP Global is the owner vis-a-vis Coke, and Coke is the charterer vis-a-vis GP Global, and that's the way that arrangement worked. Valero's contract was a contract of sale with Coke. It was not for the charter of the vessel. And getting back to your point, Your Honor, in terms of how the record is not as it sounds, is because we believe that Milos made some assertions that were just simply not accurate. For example, Milos asserts that the cargo was shipped for Valero. That is not true. Its obligation was to transport based upon its charter agreement with GP Global. Valero was only a notified party on the bill of lading. Contrary to Milos' assertions, Valero did not organize the discharge in California. Instead, owners arranged for the delivery with GP Global pursuant to the letter of undertaking, the letter of indemnity, because the bills of lading had not arrived. The choice to release that cargo was a business decision by owners at the request of the charterer, GP Global. And nobody asserts here that simply because Milos was given a lien, that that lien has value after the release of the cargo. That is correct, Your Honor. It is not as a possessory lien in this case. And I understand there are possessory liens, but there's also contractual liens. There would be if we were a contracting party with Milos in a maritime contract, but we were not. Is there an implied obligation here? Your Honor, I think that is the essence of what this case is about. And so what I would suggest to you, there are two competing lines of cases that deal with private carriage versus public carriage. Public being common carriage, they're subject to tariffs. Well, you're probably, I mean, you're looking at Pacific Coast and you're looking at States Marine, right? Those are two of the cases I'm looking at, but I'm also looking at Ingram Barge. So Ingram Barge is a case that deals with private carriage and, in essence, what that court did. Well, before we get to Ingram, Pacific Coast and States Marine discuss this implied obligation, correct? They do, Your Honor, but they do it in the context of tariffs. And there's a big difference between the cases involving private carriage and public carriage. Private carriage, I mean, or public carriage is they derive from the railroad cases. The railroad cases invariably involve tariffs. Tariffs create a contractual obligation between the carrier and the parties that are benefiting from the use of the carrier services. That is why States Marine is so important in this context. And in particular, there's a footnote in States Marine, it's footnote number three. I draw the court's attention to that specifically. It says, quote, virtually all of the cases on a consignee's liability for freight charges involve railroads operating under the Commerce Act and tariffs filed thereunder. Since the rules established in those cases depend on the common law and statutory authority derived from common law, the rules established in the railroad cases may properly be applied to ocean shippers operating under tariffs filed pursuant to the Shipping Act. But the converse of that must also be true, in that the rules derived from the railroad cases do not apply to ocean shippers and come committantly to consignees and notified parties who are not acting pursuant to tariffs under the Shipping Act. All of the cases upon which Milos relies are either railroad cases or they rely upon States Marine, but none of them evaluated that footnote in States Marine. That footnote is incredibly important because it doesn't extend the analysis. I know about footnotes, but footnotes generally, if they're important enough, you want to put them in the holding. And why are you putting so much weight on one particular footnote? Well, Your Honor, I am because the essence of that footnote is that the railroad cases can be applied in the context of shippers subject to tariffs pursuant to the Shipping Act. But that's not the case that we have. We have a private carriage case. And because we have a private carriage case, and let me step back for just a second, the distinction between the private versus public carriage cases is in public carriage, the proof of your acceptance that the obligation to pay freight is only contingent upon either your acceptance or your exercise of dominion and control over the cargo. That is not the case for private carriage. In private carriage, we look, you are a third-party beneficiary if you're a non-signatory to the contract. And as a non-signatory, you have to establish that you're a party to the contract, offer acceptance consideration. And in order to have implied acceptance, the cases basically look to four things. Have you filed suit under the Bill of Lading? Have you, by your course of contact with the carrier, have you established a course of contact over an extended period of time? Have you presented the Bill of Lading at delivery? Or do you have an agent that has accepted the Bill of Lading terms and conditions on your behalf? And did you all receive copies of the Bill of Lading? We received, Your Honor, the original Bills of Lading about a month or so after the fact. We did receive a copy of a non-negotiable bill that did not have any nuisance. And you requested the cargo presumably? Well, Your Honor, what we did is we contracted with our contracting party, Koch. That's a fancy way of saying yes. No, it isn't, Your Honor. It's not because we did not deal with Milos. We dealt with our contracting party. Our contracting party was obligated to deliver our cargo to us in California. But we did not contract with Milos. Milos is trying to create an implied consent with us. But the fact is, in terms of private carriage, we don't meet any of those four criteria that the courts have imposed upon us, imposed upon a non-signatory in order to bind them. And so our position essentially is this case is governed by private carriage, not public carriage. States Marine, all of the cases that States Marine deals with are in the railroad context. Now tell me, if private carriage, what case is controlled? Ingram Barge is a good example of what would control, Your Honor, in terms of the status. But I think that there are cases that are replete. And, in fact, we've cited numerous cases on that point. I draw the Court's attention to Docket Entry 8, Pages 31 and 32, and 34 of 49, and also Docket Entry 22, Pages 17 and 18 of 32. Those lay out all of the cases in the private carriage context that indicate what the standard is. Does the implied obligation arise out of contract or statute in those cases that recognize it? It relies, Your Honor. It depends. Again, if we're in public carriage, it's a function of the existence of the tariff. And the tariff creates a contractual relationship between the carrier and the parties who use or benefit from the carrier's services. That creates a contractual relationship. So the next step, defining an implied contractual obligation to pay freight, is very easy to obtain. And that's why the courts have done that over the time in all of those railroad cases. So in those cases, is assent given simply by accepting the cargo? It is. Under the terms of the tariff, that's the assent to the implied contractual obligation? Correct, Your Honor. But that exists in a private carriage case? It does not because there's no, for a non-signatory, you still have to have offer acceptance and consideration. And the only way the courts have found offer acceptance and consideration in private carriage is you either present the bills of lading, you sue on the bills of lading, you have a historical course of conduct over time with the carrier, which we don't, or you have an agent that accepts the bills of lading terms and conditions. And I think I'm beyond the time that I had. All right. Why don't you have a seat and then we'll let the other side go. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Conte Ciccala for Wheelus Product Tanker Corporation. Before talking about the private versus common carriage distinction that was addressed there, I think I'd want to reframe it a little bit and focus on the fact that there are three independent grounds to affirm the district court's extremely well-reasoned opinion. The first is under the Pacific Coast Fruit line of cases that talk about implied consent to bind oneself to the terms and conditions of a contract of carriage, such as a bill of lading. There's a contract, right? There's a contract. It's the way by which the Pacific Coast is absent the contract. Pacific Coast is an interesting one because. I read Pacific Coast. They really don't have the same terms, the same facts that we have here because they really were trying to figure out if there was some contract on which there could be a suit done. The Pacific Coast Court dealt with an initial Mexican bill of lading consigned by Fletcher Adshipper to itself as consignee, which then it diverted, in the words of the case, the shipment to Pacific Coast Fruit as the consignee, who then exerted dominion by then rerouting the shipments within the United States to a series of different destinations. The original bill of lading, the Mexican bill of lading, stated that the shipments in the United States would be governed by the terms of the participating carriers, which the court noted there was widespread usage of a standard form bill of lading in the United States that provided for the obligation for the consignee to provide freight. So it was effectively recognizing an implied obligation to bind oneself to those terms. Just here, don't we have a contract that's very clear that the charter or GP global is required to pay the freight? That's what the Chavoy 6, there's a paragraph in there that says that explicitly. So isn't it the case that if we look to the contracting documents to which Milos was a party, its deal was that GP global would pay freight? How do the contracting documents require or bind Valero to pay freight? Well, so it's two different, if what you're suggesting is whether under the terms of the contract or the charter party itself who was responsible to provide, to pay freight, that issue was not disputed as the court noted in its findings, the district court, that the parties did not dispute that if the terms and conditions of the charter party in the bill of lading applied, that Valero would be obligated to pay freight. And part of that is, and this was not an issue at the lower court, and it was an issue in the opening brief. It was raised for a first time in reply. So has that been waived? Because the language that the district court relied on, when I look at that, it seems to just be a fairly typical standard contractual provision that says what the conditions to payment are. And it seems that I can't see how two contracting parties can bind a third party who's not a part of the contract to pay by sending out an invoice to that party. So when I looked at the language that was cited in the reply, it seems very clear that under the agreements, at least if we read the whole thing, Valero's G.P. Global agreed to pay. I would argue it is waived, but it was one of the issues, had it been raised and discussed more in the case below the English law, would have become a more central issue. Because if you accept that they're bound through their conduct to the terms and conditions of the BL and the G.P., then English law applies, it's interpreted under English law, which does require them to pay freight as the constantee. The separate and distinct kind of places... That's really underdetermined by the district court, right? And so therefore, if we're going to go to English law, we could send this back for the district court to see what to do about English law. Because I'm not sure I agree with your interpretation of what English law would suggest. So if we're going to have a disagreement about that, it would be nice for me to let the district judge think about that first. Well, I would say, Your Honor, that if this court were to determine that they're bound, the court was correct that they did bind themselves to the C.P. through their conduct, and then the only issue is whether under the C.P. they're reliable to pay for freight. If that were the only issue, then I would obviously prefer not to go back to the district court, but I can understand that point. But the state's marine line of cases makes that unnecessary, because the state's marine line of cases makes clear that the constantee, the owner, the receiver of the cargo by exercising dominion, accepts an implied obligation to pay freight. Are you going to say to counsel's argument that that only applies in common carrier cases? I could speak at great length, Your Honor, about that, but let me focus on if states apply in more than common carrier cases, there's a lot of cases that are going to be confused in this, because I've got two different lines of cases. And if I'm going to apply, as you would suggest, states' marine to all cases, we're going to have a whole bunch of confusion out there in our law. Well, so the states, first of all, none of the cases at all focus on what they talk about a tariff. What they're talking about is the filed rate doctrine and the constructive notice doctrine. And what they're saying is that the cases rested upon terms and conditions that were set forth in a tariff, which were binding on a non-party through the filed rate doctrine that says that a properly filed or published tariff binds the parties of a force of law and that parties have constructive notice of that. And those cases, none of the cases that address this issue are filed rate doctrine or constructive notice cases. And to suggest otherwise, it's just a question of time. What is FINK? Because states' marine looks to FINK, and FINK seems to look to a statute. Well, so that obligates the receiver of the goods, the owner of the goods who receives them, to pay the tariff rate. It seems that's based on a statute. Well, that goes to where I was going to point out, where actually states' marine supplies a simple answer to this question. Because states' marine talks about the fact that in old Interstate Commerce Act cases, there was a statutory requirement for constantees to pay for freight. But it then goes on to say, in states' marine, which is an ocean carriage case, that the Shipping Act has no such requirement. The Shipping Act does not, by law, impose on a constantee to the obligation to pay freight. And then it says, therefore, it is necessary to determine where, under applicable law, there may be an enforceable contractual obligation. In other words, it segues. It says, we don't have an answer in the Shipping Act for this. Therefore, we go to this implied consent to pay freight line of cases. So the fact that the Shipping Act doesn't have an obligation for constantees to pay freight shows exactly that this is a common law, maritime common law issue, applicable to all forms of carriage. So not just common carriage. If I'm the owner of the cargo, whether I'm a part of the bill of lading or not, and I accept receipt of the cargo when it gets to port, I'm on the hook for free. Is that the rule? If you are the constantee and you assert dominion over it, such as if you're the owner of the cargo and you accept it, you become under the states' marine line of cases, you've applied the consent to pay freight. That was a contract that Valero had with another company, and that the other company is the one who accepted the freight, and it wasn't them. So I take their argument, too. So how should they be bound? Well, so that's where you go into all the different analysis, the factual analysis. And that goes to perhaps what may be an interesting issue in terms of the standard review, and it was a factual analysis based on undisputed facts that there was an implied consent to be responsible for that. If we get to the facts, they can declare all sorts of things that they're indicating that were misrepresented in the record, that Valero rushed the shipment, for example, that that was not the case. They cited some e-mails where they quoted some of the e-mails. So let me focus on, I mean, obviously we disagree, and I actually was surprised to hear that there's so much disagreement on the facts now, given that the case itself was effectively tried on stipulated facts at the case below. And I think that what we're seeing now is the implications of some of those facts lead to legal conclusions that are unwelcome, and therefore we're kind of redoubling back to the facts. That's fine. Are they wrong? They are. I mean, it's like, so for example, first of all, the... Just on that one. Rushing of the shipment. Rushing of the shipment, whether they relayed that information through Coke or not, that information, they are the ones who exercised the mandate by saying speed up the shipment. And there's one specific issue I wanted to highlight, which is the LOI, the letter of indemnity, because they make a lot of hay over the fact that they didn't tender the bills of wage they didn't have at the time, but rather the letter of undertaking. It was not voluntary for Milos to deliver against an LOI, and a carrier doesn't have to do that, and you wouldn't want to do that, certainly not if you haven't been paid freight. The charter party required them to do that. So when Valero, the charter party with GP Global, but it's Valero who took advantage, invoked the charter party by tendering a letter of undertaking, saying, well, you have to sign the contract, and not the party did the contract. All right, I got your... Correct, correct. So what I'm saying is that that, perhaps more than anything else, shows their awareness of and invoking the benefits of the charter party itself. The charter party said if a LOI is presented in the form that was set forth in the charter party, that it would have to be accepted. What about their arguments? Like, well, you all made a business decision. You released the cargo. If you have the beef, go at it with that party, not Valero. Correct. That's exactly what I'm addressing. It wasn't a business decision. It was in the charter party that they had to release against the LOI. But didn't your client freely enter into that contract that bound it to do that on the front end? I mean, you entered into the charter party. Well, that's... We're not disputing or debating whether or not they were initially parties to the charter party. But, yes, the parties entered into the contract. But the charter party said what you agreed that it said. And you got your LOI just as you said you would. And at that point, you made the determination before that you were going to be pursuant to that charter party contract. And, therefore, how can you say it was something you hated to do? You'd already agreed you would. Well, what I'm saying, Your Honor, is that it was a provision in the charter party that, in lieu of them presenting the signed original bills of lading, as they would ordinarily have done, they instead presented the LOI so that, in effect, they were doing the same thing as submitting the notes of bills of lading. And they were invoking the contract term that required it, my client, to release the cargo. Didn't your client enforce a lien at that point? At the point, this is another one of those facts, and I'm sorry, my light's flashing here, that they stated that the cargo, that freight would need to be payable directly to owners. And that information was conveyed both to Koch and to Valero. And the provision was also that the freight was payable on delivery. Yes. So they could not, in my view, have withheld delivery, but they didn't need to because of the obligations that were undertaken by them. Then they withhold delivery. If they're not going to get their money unless they deliver, it seems to me that if they're not getting their money, why deliver? I understand the point, Your Honor, but because of the term that stated that the freight was payable after delivery, it would have created a conversion-type situation if they'd withheld the cargo on those circumstances. Can I ask one more question about the implied obligation? Sure. So if the implied obligation arises in this context, what does it obligate the owner of the cargo to pay? Is it whatever is in the charter party, whether the owner has notice of those terms or not, it has to pay that even if it was a contract that was negotiated, I don't know, under certain terms where the charter or payday or agreed to pay a premium. It seems, and what I'm getting to is the argument of the owner in the common carrier context, there's some notice of what the receiver of the goods is going to have to pay. And in this context, there is no such notice necessarily if we adopt your rule. That concerns me because I'm troubled with how a party can assent to do something if they don't really know what they're assenting or agreeing to do. I understand they could go off the rails here. It would be a big old bill at the end that they didn't know about. Well, I mean, that is a hypothetical in the sense that the only charges here that were assessed were freight, which was the amount that was payable under the charter party, demerit, which was the delays associated with the offloading of the cargo, and then the charge for the speed-up charge. So would it allow for unlimited charges beyond reasonable and customary freight and what we call freight and charges, basically? I understand the court's concern there if we were asking for that, but we're not. We're asking just for the agreed level of freight demerit at the charter. But it isn't. You're just trying to put it back to your particular situation. If I adopt your general rule, it seems to me that my good colleague's question is pretty important because at that point in time, whatever that contract says, the owner has to pay even though they didn't have anything to do with the contract. Well, Your Honor, I don't know what to say other than that the states marine and the other line of cases address the obligation to pay freight. They don't go into detail as to what freight entails, and my response would be that customary and usual charges would be the appropriate measure. I guess if we interpreted states marine as you want us to, it would, but that may be one of the reasons why states marine would not be interpreted to be so broad. That's all I'm driving at. No, I understand. And I don't recall anything in the cases that talk to that specific issue in terms of the limits of what is recoverable. That's why it's under a statute or under a contract. It's a public knowledge, so everybody knows what the deal is. But, Your Honor, with respect, states marine is not based on that. I understand that's what you say, but I'm just trying to tell you why this might be right. And if I can, the one, I'll just point out one additional point with respect to the tariff filings, which is that under the Kamatsu case that we cited in our brief, the constructive notice and file rate doctrines only apply to terms which are required by law to be in the tariff, and parties other than the ship are responsible or pay freight is not such a term. And we cited the CFR that lists the mandatory terms in a tariff. So, again, it's a complete red herring, the common carriage argument. Thank you, counsel. Thank you, Your Honor. Any additional questions? No, thank you. Then we're done. All right, thank you. Thank you. Your Honor, a few points I'd like to make. One is that Valero had nothing to do with the LOI, and if you could take a look at ER 348, 349, that indicates how the LOI was issued. It was issued by the charter. Valero had nothing to do with it. The point that I made earlier about what Nelis has said is reflected, by way of an example, in their own brief on page 8. This is Dock Entry 16, where they say on July 20th, 2020, Valero contacted Coke to ask that the vessel travel at maximum speed to make the delivery window. That is not true. Valero communicated with Coke and asked what the ETA was and requested that they ask the master to consider increasing speed if the vessel became apparent that they weren't going to make their ETA. But that was a communication to Coke. That was not a communication to the vessel. May I ask you a question? So I referred earlier to the provision in the Shalvoy 6 portion of the Charter Party that very clearly says who's going to pay the freight. And it's not mentioned anywhere in the district court's decision. It does seem to crop up for the first time in the reply brief. Have you waived that argument? No, Your Honor, absolutely not. We argued that we were never obligated to make that payment. The freight payable clause only relates to the charter being obligated to make the payment. Was that issue brought before the district court, though, that provision? Yes, Your Honor. So it isn't in the stipulated facts that you should have to pay. I mean, that's his argument that you're changing the facts. No, I'm not changing the facts, Your Honor. But that's what his argument is. I know that's what he's arguing, but that's not what happened. I mean, I'm giving you the facts based upon what the record citations are. And, by the way, in terms of what the district court said about Valero agreeing that if we were bound by the bills of lading in the charter, we would be obligated to pay, we did not make any such admission. And I would call the court to the transcript of the hearing that we had before the court, and with the court's permission, we can supplement with a particular record citation. I don't have that as I stand here. I never made that any such admission. Any other questions? No, thank you. All right. Thank you very much, Your Honor, for your arguments. We appreciate it very much. The matter of Milos of Products and Incorporation versus Valero of Marketing and Supply will stand submitted. And with that, we are concluded for the day. Thank you again. All rise. Thank you. Very good. Very good job, both of you. Thank you so much. Very well done, both of you. This court for this session stands adjourned.
judges: SMITH, MENDOZA, UNKNOWN